Bussell G-. Hunt, J.
Under date of November 23, 1951, the claimant entered into a contract with the State for the excavation and grading (but, not the paving) of a portion of the Tyre-Montezuma section of the Ontario Thruway in Seneca and Cayuga Counties.' The State’s estimate of the cost of the work was $1,981,000; the claimant’s bid was $1,624,286; and, the next lowest bid was $1,859,047 (in this connection, see the minutes relative to claimant’s admissions concerning an underbid).
■ The work was to begin at station 511+00 and end at station 732+50, a distance of 4.15 miles. The special notes, which were a part of the proposal called particular attention to the wet, swampy and unstable character of the area westerly from station 680, and, the operation and control thereof exercised by the Federal Government for the protection of its national wildlife refuge therein and through which a new channel was to be excavated for the relocation of the Clyde Biver; claimant’s engineer-superintendent, Mr. Watts, called the material “ soupy ” and said that it could be pushed by bull dozers to a height of not more than 5 or 6 feet and it was necessary to adopt other means to obtain greater height. The moist and soft nature of the ground indicated to the contractor the nature of the soil he would encounter (Niewenhous Co. v. State of New York, 248 App. Div. 658, affd. 272 N.Y. 484). The special specifications, also a part of the proposal, emphasized the notice given in the special notes. Article 3 of the agreement recites that the claimant inspected the site — see, too, the paragraph entitled “ No misunderstanding” on the “Information for Bidders” contained, in the proposal; and, the claimant’s principal officer, A. K. Wikstrom, a civil engineer, testified that he and three company employees, namely, the company’s general superintendent, Mr. Johnson; an engineer who was a specialist in soil mechanics, Mr. Grow; and, another engineer, Mr. Watts, inspected the site of the work; roadway borings were examined *589 by Mr. Grow, and, numerous bidding discussions were held before preparing and submitting claimant’s bid. The claimant had been engaged in the construction field for many years and had extensive experience in excavating all kinds of materials.
Under item 2S (“unclassified excavation”) of the special . specifications, it was provided that excavated muck from the proposed roadway would be deposited adjacent to both sides thereof ‘ to the satisfaction of the engineer ’ ’, and, the excavation for a new channel for the Clyde River was to be “ to the depth and cross-sectional area as shown on the plans ”, and, the excavated material was to be disposed of by placing it “ adjacent to both sides of the relocated channel to lines and grades satisfactory to the engineer the “ lines ” referred to mean the course, limitation or contour of the spoil aera, and, the “ grades ” mean the rate of ascent or descent from a level surface (Bissell v. Village of Larchmont, 57 App. Div. 61, 66, appeal dismissed 173 N. Y. 595).
Notes on the plans stated that muck lying within the limits of the typical roadway section was to be used to form shoulders, or, was to be disposed of in the areas shown, or, as directed by the engineer. The typical section for the new channel shows that the bottom was to have a width of 55 feet and sides with upward slopes of “ 1 on 3 ”, that is, for every one foot vertical there should be three feet horizontal, and, at the existing ground level there was provided a 30-foot wide berm to run “ to toe of spoil area ”. The dimensions of the spoil area are not stated and it is not otherwise limited, except, by the limits of the State’s right of way through the swamp. It is to be particularly noted that the special specifications provide for excavation of the material to the depth and width shown on the plans, but, with respect to the disposal thereof, that the same should be placed according to lines and grades satisfactory to the engineer. In this respect, the special specifications modify the general specifications which provide that unsuitable material should be placed “ in spoil banks ■ provided by the contractor at his expense or at locations within the right of way as designated by the engineer ”.
The channel excavation work was started on December 5, 1951, and, by December 20 the claimant had completed about 200 feet of new channel excavation and had piled the muck in banks up to 20 feet high. The area provided by the State for the spoil was utilized only in part. On the afternoon of December 20 about 150 feet of the completed north side of the channel slope, berm and spoil bank slid into the excavated area (several slides of high piled muck had occurred elsewhere on the job *590 and caused the State to limit the height of the spoil banks). The State engineer stopped the excavation work. Under the “ damage ” clause of the general specifications the risk of the work was on the contractor until inspected and accepted and where damage occurs, without fault on the part of the State, it is his obligation to repair the same. (Gar ofano Constr. Co. v. State of New York, 206 Misc. 760, affd. 1 A D 2d 306, affd. 4 N Y 2d 748.) There is no evidence that the work had been inspected and accepted at that time, and, as hereafter found, there was no fault on the part of the State.
The State’s Bureau of Soil Mechanics conducted an investigation and study to determine the cause of the slide and seek a remedy to prevent future slides. It was found that the cause of the slide was the instability of the muck, the height to which it was piled and the pressure exerted on the area beneath. It was recommended that to avoid endangering completed work and to obtain stabilized spoil areas, the muck should not be piled in excess of 8 feet in height on the same “1 on 3” slope except in the area of the slide where the height should be limited to 5 feet, and, the district engineer so ordered the claimant. These two claims followed. They were consolidated for trial purposes.
The theory of claimant’s claim is that the typical cross section of the channel to be excavated shows a design of a spoil bank with a minimum height on the north side of 22 feet (and somewhat higher on the south side), and, that pursuant thereto it had the right to pile the muck to at least that height, and, if the spoil banks were unstable it was because the design was faulty; furthermore, that the design of the spoil bank was a misrepresentation because the State secretly intended to limit the height of spoil to five feet to comply with a requirement of the Federal G-overnment in that respect.
The cross section referred to was a cross section of the channel— it so states. It does not state it is a cross section of a spoil bank and was not intended as such. ‘ ‘ The rule of exclusion of that which is not expressed finds its place here ’ ’ (Freston v. Lawrence Cement Co., 155 N. Y. 220, 223). The special specifications under item 2S make this clear by stating that the channel was to be excavated as shown on the cross-sectional area on the plans, but, that the excavated material was to be disposed of “ to lines and grades satisfactory to the engineer ’ ’ (see, too, the general specifications). The lines on the channel side of the spoil area are not indicative of a design, but, are simply to show the limit of the encroachment of the spoil on the berm. It was impractical to design a spoil bank for *591 the kind of material to be excavated under this contract. There is no discrepancy or ambiguity calling for a different construction. ‘ ‘ A bidder is not entitled to rely on the plans alone but is required to resort to the contract and the specifications ” (Dunbar & Sullivan Dredging Co. v. State of New York, 259 App. Div. 440, 446, affd. 291 N. Y. 652; see, too, Whitney-Dierks Heating Corp. v. State of New York, 207 Misc. 423, affd. 3 A D 2d 948).
The second part of claimant’s theory is likewise unsupported by the evidence. It is based upon evidence by the then State’s engineer (since retired) in charge of planning and design work for the Thruway in the area which embraced the contract work herein. He testified that the State acquired only a limited right from the Federal Government to cross the wild-life refuge and for a width which would permit spreading the excavated muck to a height of 5 feet if the Federal Government should so require. There is no evidence that the Federal Government, or the State, so required for that purpose.
The State’s limitation npon the spoil bank height was solely for the purpose of acquiring a stable bank which would not slide and was based upon an investigation and study conducted by the State’s Bureau of Soil Mechanics after the slide occurred. The fact that the State engineer did not object when the claimant piled the spoil to heights of 20 feet is clear evidence that the State had no undisclosed plan to limit the height to 5 feet. The evidence disclosed that the engineer acted to limit the height and slope of spoil banks when they proved to be unstable elsewhere and on such occasions his directions were complied with by the claimant. Where, as here, there was no fault on the part of the State, it is incumbent on the claimant to repair the damage. There was no showing of bad faith or misrepresentation on the part of the State; the claimant made its own investigations and drew its own conclusions and if they turned out to be erroneous the loss must be upon it (Hopkins v. State of New York, 282 App. Div. 994). Justice and equity do not require the State to reimburse a contractor for increased expense unless the mistake was due to the act of the State (Weston v. State of New York, 262 N. Y. 46). Such is not the case here and the claims are dismissed.
This constitutes the decision in the above-entitled cases pursuant to section 440 of the Civil Practice Act.
Let judgment be entered accordingly.